Good morning. May it please the Court. My name is Henry Farber, and with Joseph Hoag, we are here representing Aerojet Rocketdyne, and we'd like to reserve two minutes for rebuttal, please. We are asking the Court to reverse the District Court and vacate the arbitration award at issue here on two grounds. First, that the arbitrator exceeded his authority given to him by the parties. He did that in two ways. One, he ruled on an act that was committed in 2013 when the underlying collective bargaining agreement was not created until 2014, and the issue very clearly presented to him by the parties was, was there a violation of the 2014 collective bargaining agreement? The second way he exceeded his authority was by compelling the parties to negotiate a modification of that agreement. Our second ground in which we ask you to vacate the arbitration award is because the award didn't draw its essence from the collective bargaining agreement. We know that, first, because, as I just mentioned, the violation consisted of conduct prior to the creation of that collective bargaining agreement. We also know that because he negated the parties' agreement that Program H, the pension plan that's at issue here, would apply. And most importantly, we know that on the key point, he found that there was no agreement between the parties, no meeting of the minds, and he ordered the parties to negotiate a new agreement. And that's just not a remedy issue. That shows the fault in the award itself, that he was not construing the agreement. He was requiring the parties to create a new agreement. And so, therefore, it cannot draw its essence from the collective bargaining agreement. I want to just briefly point out some key points about the timeline here, because the timeline is very important. The prior owner of Rocketdyne, UTC, and Aerojet entered into a stock and asset purchase agreement in July of 2012. They amended that, and that transaction closed in June of 2013. Program H, the pension plan at issue here, was implemented at the end of 2013, or by the end of 2013. After that, in September of 2014, the parties negotiated a new collective bargaining agreement. And in that collective bargaining agreement, they held that the provisions of Program H would apply, subject to some changes that they negotiated. How is it that the union didn't request a copy of Program H? How is it that you didn't provide them with a copy of Program H, just routinely? How is it that this wasn't sitting on the table someplace? Well, so, as I'm sure the Court knows, there is an obligation under the National Labor Relations Act to provide information that is requested by the other party that's relevant to the negotiations. And pursuant to the request of the union, the employer provided the summary plan description of Program H. There was not a request for the actual plan itself, and so the employer provided that mechanism. And it may be that there was no further request because the program had already been implemented a year earlier, in 2013, and the parties were operating under that. And the focus of the parties at that time were on changes being made to Program H. Okay, had the grievance been filed by this point? Had any grievance been filed about the, about the retirement? Well, the grievance that led to this arbitration had not been filed. That was not filed until even a year later, in 2015. Anything similar that had been filed? The only thing that was filed, no, the answer is no, the only thing that was filed in 2012, when the purchase was first announced, the union filed grievances against UTC. But those were resolved in the court. Program H was not in place, so to speak? Or was it, in your view? Program H was implemented in 2013, but there was no grievance challenging that. And when I say in play, I mean there was not a question about what was going to, how it would apply. That's correct. So let me ask you, you obviously, both parties are very familiar with all the case law about deference to the arbitrator, and, you know, that doesn't get you to the end of the question. But if we were to determine that the arbitrator did engage with the CBA, and then went further and looked at the surrounding issues related to the history and the negotiations, and therefore we uphold the interpretation that the arbitrator gave, what does that do with the remedy? Because now everyone says, well, this remedy is unworkable. So I'm wondering, can you have a split in the confirmation of an arbitration? I think because the merits issue here before the court and the remedy issue are so tied together that that would be a difficult thing to accomplish. And I say that they're tied together because the arbitrator's award, even putting aside the order that we contact UTC and ask them to help us out, putting that aside, the other part of the order is that the parties negotiate a new agreement about what the offset should be. That itself shows that he wasn't interpreting or applying the current collective bargaining agreement. But if you were to then uphold that and confirm the merits portion of it and then try and find a remedy, we think that is a new case. It's a new arbitration at that point about how to resolve that dispute. Okay, so that's my question, is you would then have a new arbitration on that point, and would it be in front of the same arbitrator or would that be to be determined? As a practical matter, a month ago I might have answered differently because we've now had the remedy hearing before the arbitrator. There was not a stay of the district court's decision, and the parties have invested their time and effort in having the remedy here. We don't have a decision yet, and the briefs aren't filed. I guess the answer is it has already happened. Yeah, as a practical matter, we've had that remedy hearing. And so my guess is the parties would just proceed with that. Counsel, the party who filed the grievance that set all of this off thought that he was shorted about $26 a month. The big scheme of things, not a lot of money. How much money is at stake here? How many people are we talking about that are affected, thousands, hundreds? So the numbers vary between the parties a little bit, but we're generally talking in the range of 50 people. And we learned from the remedy hearing that there actually is agreement among the parties that from the standpoint of actuarial equivalence, Program H on its offset provides benefits that are actuarially equivalent to what the employees would have received had there been no transaction, had UTC just continued in place. And the only issue is based on the statements of UTC in 2012. So what are we – I mean, the question is – It's a double-dipping problem, I think, from UTC's perspective is, wait a minute. We're giving you both early retirement and we're giving you the full benefit of your retirement. That's right. And I realize I'm speaking a little bit outside the record. I want to be careful of that. But we can provide from the transcript of the remedy hearing proof of that statement that both parties agree that there's actuarial equivalence between Program H and the pension numbers in effect. What I would consider a relatively small number of people in the pool, which isn't often the case, and the amount of money without making a judgment about the actuarial equivalent. I mean, is this, at this stage, a case that could be mediated to resolve these final details? I want to be careful how I answer that because the parties have ongoing discussions. May I just end there? Sure. Okay. And the only reason I bring it up is that often there are ongoing discussions and sometimes they're productive and sometimes they're not. But we have a very professional staff of mediators at the Ninth Circuit that could be invoked at the party's desire. I'll leave that at that. Okay. Well, I will say we had discussions even as late as last night. But the union's claim in the remedy hearing, despite the small number, is $5 million. So not an insignificant amount of money. I recognize it's not insignificant. All right. I mean, there's one other question that goes to this question as to whether you're mediating, whether there's ongoing discussions, is, is there any reason to ask this court to hold any decision that we might make pending to ongoing discussions? I mean, you don't have any control over that unless you advise us that you wish us to stay our hand until you try and work things out. I will speak for myself. I would encourage you to ask my colleague the same question. We would not have an objection to that. Because otherwise we might. To holding. To holding. Okay. We could jump into gear and work all night and issue a decision, and then one side or the other might not be happy. Please don't do that. All right. I can safely say please don't do that. All right. Okay. So let me turn then to the reasons for vacating the ward as a whole. The issue, it's, the case law tells us that an arbitrator's authority is limited to the issue presented to him by the parties. But the parties have agreed to arbitrate. The issue as found by the arbitrator was, was there a violation of the 2014 Collective Bargain Agreement? And you can find that in ER page 82. And it's clear that he was referring to the 2014 Collective Bargain Agreement because he says this arbitration arises under the Collective Bargain Agreement effective September 28, 2014. That's on the same page of the record. His analysis of the arbitrability is all about the 2014 Collective Bargain Agreement. And you add to that the Collective Bargain Agreement contains limits on what can be arbitrated. It specifically says no grievance arising out of events that occurred prior to the execution of this agreement in September 2014 shall be submitted to arbitration under the provisions of this agreement. Nevertheless, the arbitrator found that implementing Program H in 2013 to be a, was a violation. And his words were there is no dispute Program H became effective by the end of 2013 during the term of the 2011 Collective Bargain Agreement. Isn't the arbitrator's point, though, that all of this really has to do with CBA formation? That it was really a question of things that were represented to the union and that the union had no further reason to question the word of the officials that they were, that they thought they had heard clearly and in good faith. And, therefore, the CBA itself is deficient because of the way in which it was formed. Well, I would say that a little differently because the arbitrator did not rely on the statements made by UTC to the employees in finding a violation. What he says is neither party knew what was going on then. Aerojet didn't know what was going on and UTC, and the employees didn't know what was going on. But even if that's the case, there's a break in the chain here. And that is in 2014 the parties negotiated a new agreement. And the 2011 agreement didn't have any reference to Program H because that was an aerojet program, not a UTC program. And so they clearly had to discuss the implementation of Program H at that point. And, yes, there's no evidence in the record that the union had the full plan, but they had the summary plan description. They had the right to ask for the full plan. And I would also tell you as someone who negotiates collective bargaining agreements, it is a very dangerous path to walk to say the union didn't ask the right questions so you get to revisit the agreement. Well, that's maybe not the . . . The question I have, if you look at cases like ASARCO, where the interpretation did seem more than a few degrees off, the court said, well, you know, they looked at the totality and we enforced the agreement. We might disagree. And we might disagree here if we are interpreting, because many of the arguments you're making are contract interpretation arguments. And the question is at what point do they tip over so you can tip the decision? Here it seems, you know, objectively we might have made a different decision, but the arbitrator did go through all of this, what you're talking about, did acknowledge that they didn't ask, but also said in the end you didn't have a meeting of mind on the contract. What is your best case for us being able to invalidate the arbitrator's decision in these circumstances? Our best case, I believe, is that the arbitrator found that there was no agreement. An arbitrator's job is to interpret or apply the agreement. And when he said there is no agreement, there is no meeting of the minds, that's not an interpretation or application. That is very different than Osarco, where the arbitrator made an interpretation of the agreement. Do you think he doesn't have that authority? I do think he does not have the authority to say there is no agreement between the parties. Who has that authority? I think that would be a court issue. In Osarco, it was essentially a reformation question. And if parties want to reform the contract, they go to court to reform the contract. Certainly they can give the arbitrator that authority, but neither side did that in this case. Isn't the decision here that there was no meeting of the minds also end up being a determination of what contract is then binding? I mean, it ends up in a contract interpretation, doesn't it? In some cases, it could have been. In this case, it's not because what the arbitrator ordered was for the parties to negotiate a contract. He never came to any conclusion about what the contract is and what it should be. He left that to the parties. An arbitrator's job in part is to fill the gaps in the collective bargaining agreement. He created a gap. He said there's no agreement on this issue, and the parties have to fill that gap themselves. And I see my time has run way low. May I reserve the rest of my time, please? You may. Thank you. Paltry as it is, I'll give you some additional time. Okay, thank you. Good morning, Your Honor. Michael Anderson for the United Auto Workers. At the outset, yeah, I will check with my client about the question about the mediation office. I think that the parties are making progress, so that may be a rational way to proceed. But we'll hold tight. Why don't we do that? Okay. And since you've now represented this to us, and we appreciate it very much, and I think we will represent to you that we are not going to do anything until we hear from somebody. Okay. So I think, you know, a joint submission, something that says we tried to work this out, and we've done our best, and it didn't work out. I don't want to overcommit, but I think that that will be possible. Okay. And we're just saying if you want to use the mediators. On the other hand, being in the labor field, you have access to not only excellent lawyers like yourselves, but any host of other resources. There's a threshold issue that was not touched on in the opening argument, which is that the court does not have appellate jurisdiction in this case at this time. What Judge Gutierrez did is he confirmed the liability findings of the arbitrator, but vacated in part, based on the submissions of both the union and the company, and sent it back to the arbitrator to revise the remedy. That means that as of this morning, there is no court-confirmed order that the union can point to to compel Aerojet to do anything, and there won't be until the arbitrator resolves a new remedy and the district court either enforces or vacates that remedy. This is just a basic issue of finality that is no different than you would have if a defendant was aggrieved by the fact that their motion for summary judgment on liability was denied and wanted an appeal before the court, the district court, went through remedy proceedings. The court's recent decision in Sanchez v. Elizondo sketches out this distinction. And before we decide this issue, I would urge the court to look at the Second Circuit's opinion in Landy Michaels v. Service Employees, which is cited in Sanchez, which is essentially identical to the present case. A district court confirmed an arbitrator's liability findings, but sent the remedy back for a recalculation of the damages to the arbitrator. The employer appealed at that point, but the Second Circuit said that under Section 1291, that partial vacature left no final confirmation order for the court to review. And I also supplied the court with an unpublished decision that came down, I believe, this June, in which this court dismissed an appeal in a similar case in Cascade General. If the court concludes, nevertheless, that it has jurisdiction, you should affirm Judge Gutierrez. The first question about the arbitrator exceeding his authority because he allegedly decided something that the company says arose before the 2014 collective bargain agreement was presented to and argued to the arbitrator. What the arbitrator did was he said that the actual breach did not occur until 2015 when employees actually applied for benefits and discovered that the offset that they had been promised would not be applied was being applied after all. And the arbitrator concluded that, therefore, the accrual of this grievance, the dispute actually arose in 2015 during the term of this agreement. Now, that was an entirely plausible and enforceable conclusion to make in the first place because that is the very accrual rule that the Ninth Circuit applies in analogous ERISA cases. When a plaintiff claims that a plan was improperly amended and brings a cutback action under ERISA, this Court concludes that the cause of action only arises when that person applies for benefits and not at the earlier time when the plan might have actually been amended. Breyer. But an accrual rule is different from the question as to whether the arbitrator can decide that there is no agreement to interpret as, instead of just saying, well, here's my understanding of the arbitration agreement. Agreed. And that is a separate issue, but going directly to that. The arbitrator did not say there is no agreement. The arbitrator said the parties agreed to Program H without this offset that was unilaterally slipped in. So what the arbitrator said when he said there was no meeting of the minds, he said there was no meeting of the minds as to the offset. But he didn't say that there was no agreement. In effect, what he said is that what the parties agreed to was Program H, but not the offset that the employee unilaterally slipped in. But you have three different parties and two different contracts that you're talking about. One is Program H, which is between the corporations, and the other is the CBA, the 2014 CBA. Correct. Which assumes the existence of Program H. Exactly. But what the arbitrator effectively held was that the union's understanding, which he held to be the actual meaning of the agreement in 2014, was Program H, but without this offset, because the offset had been represented to the union as something that would not be charged against the employees. I'm still curious as to why the union didn't go around and verify that what had been promised them had been, was brought to bear when the two corporations actually merged to put together Program H. And let me tell you why. So having reviewed last night the arbitrator's decision, having read the transcripts of the hearings of concerned employees as to what's going to happen to our pension, I'm struck by the fact that the employees realized that this was a double dip, that they were getting something they had not expected and had not previously bargained for, because they were going to be able to take early retirement and still get a full benefit of their retirement. That just almost feels like, and I think the evidence is, they were a little surprised by this. They apparently asked repeated questions and got the same answer back, and everybody went away pretty happy about the whole thing. It seems to me that somebody might have wanted to verify that all of that was still in the agreement when the two corporations got done. That may be true, but the goody, what you're describing as the double dip, was seen at the time as the sweetening of the deal that would persuade the union not to file a grievance and not to challenge the institution of the new pension plan back in 2013. And I understand your point that in collective bargaining negotiations in 2014, it would have been prudent for the union to demand the copy of the Program H in 2013. Except that the arbitrator had the authority to say that the union was entitled to rely on the representations that had been made beforehand. And you may disagree with that as a matter of contract interpretation. It's funny, but of course those representations are made by UTC, not the acquiring company. They are made by the company, because they are made on behalf of the company by the UTC people as the company's agents. The union has no collective bargaining relationship with the parents. Right. But my point is, you might have wanted to verify that the benefit of this very good deal was actually conveyed when the two companies decided to merge and had an agreement to do so. Well, if I had been advising the union at that point, I would have recommended that. But the fact remains that the arbitrator has the authority to say, I conclude that the pension agreement that binds the parties is Program H minus the offset. And the language about there being no meeting of the minds is not that there is no contract and I'm going to make one up as an interest arbitrator. It's that the offset that the company is trying to enforce against the employees now was never agreed to by the union, and therefore I don't give effect to that in construing what the parties actually agreed to as a pension commitment. So if we were to disagree with you as to whether there's jurisdiction, let's just assume there's jurisdiction, I'll ask you the same question that I asked your colleague, and that is what if we agree with you with respect to needing deference on the contract interpretation, even if we think it's a stretch? What do we do then if we look at what was ordered with respect to the remedies? Are they so intertwined that we can't split them in terms of the confirming? I mean, there would be no appellate jurisdiction to review the remand, and we don't know what the remedy is yet. No, but we don't know that yet. But if we're looking at the arbitrator's decision, which is the liability which it's been referred to, which is really the contract interpretation, and then if we were to take the Aerojet's interpretation that he's basically asking for a redo on the contract in the remedies, how does that work? I mean, because this is a troubled issue. Right. I would say that it's very common for arbitrators to remand things to the parties as long as the arbitrator has the final decision if they can't agree. So, for instance, an arbitrator would order back pay, would not determine the amount, leave to the parties to hash out, but they always get to come back to the arbitrator if the parties can't agree. And that's the union's position about what that remedy would mean, that when Judge Gutierrez sent the remedy back to the arbitrator, it may involve some degree of mediation, that the parties talk about what they're willing to do, but ultimately if the parties can't agree, the arbitrator imposes that as a remedy. And that's not the creation of a new contract. That's simply awarding a remedy for the breach of the contract. And if the court concludes that the arbitrator was enforceable in finding that, on the merits, the contract was breached, then the arbitrator has very broad authority under the Steelworkers Trilogy to devise a remedy. That's not the creation of a new contract. That's just coming up with some means to remedy the breach that the arbitrator found. One last point that I think is important to think about when we're talking about the merits. In this case, Aerojet agreed that the arbitrator would have the authority to decide arbitrability. That's in the petition, Excerpts of Record 24, Paragraph 21. And that adds a whole new order of magnitude onto the deference that is already due to the arbitrator. Aerojet wasn't required to do that. They could have said, we don't think this is arbitrable and we reserve our right to bring an independent judicial challenge. But once they devote the question of arbitrability to the arbitrator, they are bound by the arbitrator's conclusion, even if they later want to argue to a court that that's wrong. And the Supreme Court's decision this year came after the briefs that I put in the 28J in Henry J. Shine confirms that where the parties do devote the issue of arbitrability to the arbitrator, that courts can't make up special doctrines that vary the standard of review from the way that they would review the arbitrator on the merits. So when the arbitrator concluded that he wasn't adding to the contract, that he concluded that the actual pension agreement was Program H minus the offset, and that this grievance didn't arise until people applied for benefits in 2015, he's effectively interpreting all of the contract clauses that the company is now arguing to you. And the issue at this point is not whether this court believes that the arbitrator was right or wrong, but whether the arbitrator was honestly confronting the conflicting arguments about the interpretation of the agreement and resolving them. Arbitrator Horowitz clearly did that, and therefore to the extent that this court would have jurisdiction to review the merits at this point, it would have to affirm Judge Gutierrez. The final point I would make is that that would, of course, leave the remedy which has yet to be decided based on the remand order. I mean, that is to say the revised remedy that Judge Gutierrez ordered to be done pursuant to the vacature. That would then work its way up to the district court and could end up before this court again on review of a court-enforced remedy finding. But the reason why there are strong finality rules under Section 1291 is to keep this court from having to entertain piecemeal appeals like that. That's why Aerojet is perfectly free to raise all of the arguments on the merits that it's making to you now once there is a final court-enforced complete arbitration. But until that time, you don't have jurisdiction. If you find that you do have jurisdiction, you should affirm. Thank you. Thank you. Would you, Ms. Knox, put two minutes on the clock for rebuttal? Thank you, Your Honor. I just have several points that I'd like to make in response. First, with respect to the jurisdiction of the court and whether or not there's a final order, this case is very different than Sanchez and Landy Michaels. Those were cases about miscalculation and sort of administrative errors in the arbitrator's award. This is not that kind of case where the district court ordered a whole new remedy. Right. But Mr. Anderson's last point was if the arbitrator comes to a decision, you don't settle the case. If the arbitrator comes to a decision, then you want the district court to overturn this and you've got a right of appeal back to us. We're right back here on the remedy, and we've handled the whole thing piecemeal. Well, that is a possibility. But the other side of that coin is we have argued to you in our briefs that this should not be remanded to the same arbitrator, and this is our time to make that argument. But you didn't ask for a stay, so you've already gone to the same arbitrator. That's right. I mean, we're trying to be efficient and economic in how we do this. I understand that. So it's kind of moot, isn't it, in terms of that request? You're now asking us to take away the arbitrator's ability to decide something that he may, by the time we decide that, he may have already decided. Well, we have, to be frank, we have more control over when the arbitrator issues his decision than when you do, other than the comments that we've expressed earlier this morning. The other thing on the arbitrability question, counsel talked about how the arbitrator decided the breach didn't occur until 2015. That's a different issue. We raised in the arbitration below that the grievance wasn't timely, and that's a procedural arbitrability question. That is clearly for the arbitrator. We let the arbitrator decide that. He decided the grievance was timely, that someone could file a grievance saying, I'm not getting enough benefits. That's not before the court now. What's before the court now is the arbitrator's determination that there was no agreement in the 24 agreement, and that's the point I want to focus on the most. The arbitrator did not say, and I would encourage you to read the award, that there was program H minus the offset was the agreement of the parties. What he said was, there's no meeting of the minds. I can't decide what the agreement of the parties is, so the parties have to negotiate. If he had found that there was an agreement of the parties, he wouldn't have sent us off to negotiate. Unless there are further questions? No. Thank you very much. Thank you. Thank you to both counsel, both for the briefing and for the argument this morning. The case of Aerojet Rocketdyne v. UAW is submitted and we're adjourned.
judges: McKeown, Bybee, Gaitan